HDC/TKK/USAO#2011R00318

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2011 OCT -3  P 1: 56

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. WDQ-11-0540 |
| | : | |
| RODNEY R. HAILEY | : | (Wire Fraud, 18 U.S.C. § 1343; Money |
| | : | Laundering, 18 U.S.C. § 1957; Clean Air Act |
| | : | Violation; 42 U.S.C. § 7413(c)(2)(A); |
| | : | Forfeiture, 18 U.S.C. § 981(a)(1)(C) |
| | : | |

...oooOooo...

## INFORMATION

The United States Attorney for the District of Maryland charges that:

## COUNT ONE

### (Wire Fraud)

### INTRODUCTORY ALLEGATIONS

At all times relevant:

1.     **RODNEY R. HAILEY** was a resident of Perry Hall, Maryland and the owner of

Clean Green Fuel LLC ("Clean Green Fuel").

2.     Clean Green Fuel was a registered Maryland limited liability company with

addresses at: (a) 9940 Franklin Square Drive, Nottingham, Maryland; (b) 10801 Catron Road,

Perry Hall, Maryland, and (c) 7521 Pulaski Highway, Baltimore, Maryland, which purported to

produce and sell bio-diesel fuel.

3.     Bio-diesel fuel was a motor vehicle fuel derived from renewable resources that

could be used like any other motor vehicle fuel.  The Government policy encouraging its

1

production and consumption was intended to reduce the nation's dependence on imported oil. To

that end, the Energy Policy Act of 2005 ("Energy Policy Act") amended the Clean Air Act to

require the United States Environmental Protection Agency ("EPA") to promulgate regulations to

increase the amount of renewable fuels used in motor vehicles in the United States pursuant to

Renewable Fuel Standards (RFS).

4.      Among other things, the Energy Policy Act required all oil companies that market

petroleum products in the United States either to (1) produce a given quantity of renewable fuel

themselves or (2) purchase credits called renewable identification numbers (RINs) from producers

of renewable fuels to satisfy their renewable fuel quota requirements.

5.      The RIN credit program worked as follows: Whenever a producer of renewable fuel

produced a given quantity of product, it generated a RIN. Each RIN was a unique 38-digit number

that documented the production of a specific quantity of renewable fuel by a specific producer.

When the producer distributed the renewable fuel - e.g., by blending it with a fossil fuel and selling

it - the producer was entitled to sell the RIN to a broker or a major oil company, who could then

use the RIN to satisfy its EPA obligation. The failure of oil companies to satisfy such obligations

could have resulted in significant civil penalties imposed by the EPA.

6.      It was unlawful for a producer of renewable fuel to generate a RIN without actually

producing renewable fuel. Moreover, every transaction involving the purchase or sale of a RIN

had to be reported to the EPA in the manner set forth in the RFS1 regulations. In particular, 40

C.F.R. § 80.1152(c)(1) required renewable fuel producers who generated and sold RINS to submit

quarterly RIN transaction reports that included specific information about each RIN transaction.

40 C.F.R.§ 80.1152(c)(2) required RIN sellers and purchasers to submit a quarterly RIN activity

2

report that summarized RIN activities for the reporting period.

## THE SCHEME AND ARTIFICE TO DEFRAUD

7.      Between March 2009 and February 2011, in the District of Maryland, the defendant

### RODNEY R. HAILEY

knowingly and willfully devised and intended to devise a scheme and artifice to defraud various

brokers, energy companies and others, and to obtain money and property by means of materially

false and fraudulent pretenses, representations and promises, as more fully described below.

A.      **HAILEY's Sale of RINS**

8.      It was part of the scheme and artifice to defraud that **HAILEY** represented that he

was a producer of bio-diesel fuel, when in fact he produced no such fuel, and sold RINs

representing the production of more than 21 million gallons of the non-existent fuel to major

energy companies for more than $9 million.

9.      It was further part of the scheme and artifice to defraud that on March 26, 2009,

**HAILEY** registered Clean Green Fuel with the EPA as a producer of bio-diesel fuel, claiming that

Clean Green Fuel would produce bio-diesel fuel in a production facility located at 10939

Philadelphia Road in White Marsh, Maryland.

10.      It was further part of the scheme and artifice to defraud that between March 2009

and December 2010, **HAILEY** sold 32,189,750 RINS to various brokers, including MudSkippers

Investments, OceanConnect.com, Inc., Green Diesel, and International Exchange Services, as well

as to Conoco, a major oil company.  The RINS that **HAILEY** sold to the brokers were resold as

often as two or three times at increased prices.  Twenty-four "obligated parties"– *i.e.* the major

energy companies obligated to comply with the EPA regulations – used the RINs to meet their

3

compliance obligations.  The obligated parties believed that the RINS were valid and remain

exposed to civil penalties of up to $32,500 per day.

11.      It was further part of the scheme and artifice to defraud that **HAILEY** falsely held

himself out as a producer of bio-diesel fuel.  In reality, **HAILEY** did not produce any bio-diesel

fuel, nor did he have a facility capable of producing bio-diesel fuel.  Instead, his business operation

consisted solely of generating false RINS on his computer and marketing them to brokers and oil

companies.

12.      The companies that purchased the false RINs wired their payments (or mailed

checks) from various states outside of Maryland to **HAILEY**'s Maryland bank account at M&T

Bank ("account ****9901").  The account  was controlled exclusively by **HAILEY**.  Between

September 2009 and December 2010, **HAILEY** received more than $9.0 million from the sale of

false and fraudulent RINs as follows:

| | |
|---|---|
| MudSkippers Investments (RIN broker) | $ 34,980.00 (by check) |
| OceanConnect.com, Inc. (RIN broker) | $ 6,520,141.55 |
| International Exchange Services (RIN broker) | $ 158,760.00 |
| ConocoPhillips (oil company) | $ 1,689,519.25 |
| Green Diesel | $ 687,830.00 |
| **Total** | **$ 9,091,230.80** |

### B.      Concealment of the Scheme

13.      It was further part of the scheme and artifice to defraud for **HAILEY** to submit a

Quarterly Report to the EPA claiming that Clean Green Fuel had produced 2,227,500 gallons of

bio-diesel between October and December 2009 .  **HAILEY** signed and submitted this false report

4

to the EPA, which was required under the Clean Air Act, in or about March 2010.

14.   On July 22, 2010, two civil inspectors from EPA's Office of Enforcement and Compliance Assurance, Office of Civil Enforcement, Air Enforcement Division in Washington, D.C. visited Clean Green Fuel's headquarters to inspect **HAILEY**'s bio-diesel production facility, in response to a complaint alleging that Clean Green Fuel had been selling false RINs.  During that visit, and in a follow-up visit on July 28, 2010, the EPA civil inspectors asked **HAILEY** for business records related to his bio-diesel production, asked numerous questions about his operation, and attempted to inspect his production facility.

15.   It was further part of the scheme and artifice to defraud that **HAILEY** falsely told the inspectors that his production facility was on Shell Road in Curtis Bay, Maryland.

16.   It was further part of the scheme and artifice to defraud that **HAILEY** falsely told the inspectors that he paid employees and contractors to recover waste vegetable oil from 2700 restaurants in the "Delmarva" area and bring it to his production facility where he converted it to bio-diesel fuel.

17.   It was further part of the scheme and artifice to defraud that **HAILEY** falsely told the inspectors that his "production records" were maintained at his production facility on Shell Road in Curtis Bay, Maryland, when, in fact, **HAILEY** knew then and there that there were no such records since he had not produced any bio-diesel fuel.

18.   On July 28, 2010, EPA Air Enforcement Division civil inspectors returned to Clean Green Fuel's office in White Marsh, Maryland for a follow up meeting with **HAILEY** and his attorney to inspect his production facility.  It was further part of the scheme and artifice to defraud that **HAILEY** falsely told the inspectors that his production facility was actually located at 7521

5

Pulaski Highway, Baltimore, Maryland. In fact, **HAILEY** knew then and there that these statements were false since he did not produce any bio-diesel at any purported production facility.

19.    It was further part of the scheme and artifice to defraud that when asked about the absence of any of the necessary equipment at that location, **HAILEY** falsely explained that he had recently removed all of the equipment and sold it. **HAILEY** provided photographs which he claimed showed the facility when it had been in operation. The inspectors observed that the photographs were of a different location. When asked to whom he sold the equipment, **HAILEY** falsely responded that he had sold the equipment but could not remember to whom.

20.    On December 14, 2010, EPA's Air Enforcement Division sent **HAILEY** an official Request for Information under Section 114(a) of the Clean Air Act, requesting information concerning the company's renewable fuel production and import activities, and its production plants, as part of a civil investigation to determine compliance with the CAA and the applicable fuels regulations.

21.    It was further part of the scheme and artifice to defraud that on January 18, 2011, **HAILEY**, through a letter from counsel, provided EPA's Office of Enforcement and Compliance Assurance (OECA), Office of Civil Enforcement, Air Enforcement Division a false written statement that Clean Green Fuel never created or transferred an invalid RIN during the requested time period (May 1, 2007 thru January 18, 2011).

22.    It was further part of the scheme and artifice to defraud that on February 4, 2011, **HAILEY**, through his attorney, provided an eleven-page written response to OECA's 22-question request stating, among other things, that –

a.    Clean Green Fuel produced all of its renewable fuel at 7521 Pulaski Highway,

6

Rosedale, Maryland from November 2009 until it ceased all production operations on June 28, 2010.

      b.      Clean Green Fuel could not produce any records identifying restaurants it used in the collection of waste vegetable oil in the production of bio-diesel as it had contracted out the collection of the waste vegetable oil.

      c.      Clean Green Fuel had never created or transferred an invalid RIN.

      d.      Clean Green Fuel had not transferred to any person a RIN without transferring an appropriate volume of "renewable fuel" to the same person on the same day.

      e.      Clean Green Fuel by proprietary self-developed processes, removed fuel from tanker trailers, blended-in biomaterial, and immediately returned the blended product to the same tanker trailer, involving no purchase of renewable fuel, and no fuel purchase transaction documentation.

      23.      At the end of the written response was a certification signed by **HAILEY**, as President of Clean Green Fuel, certifying that the information contained in the response to the EPA's request for information and the accompanying documents was "true, accurate, and complete." As to the portions that he could not verify, he certified that the information was, to the best of his knowledge, "true, accurate, and complete," when, in fact, **HAILEY** knew that the information he provided was false.

7

## <u>EXECUTION OF THE SCHEME AND ARTIFICE TO DEFRAUD</u>

24.     On December 21, 2010, in the District of Maryland, the defendant

### **RODNEY R. HAILEY**

devised and intended to devise a scheme and artifice to defraud and to obtain money and property

by means of materially false and fraudulent pretenses, representations, and promises, and for the

purpose of executing this scheme and artifice to defraud, did knowingly transmit and cause to  be

transmitted by means of wire communication in interstate commerce, a wire transfer in the amount

of $762,480 from OceanConnect.com's JP Morgan Chase's bank account in New York to

**HAILEY**'s account at M & T Bank located in Maryland for the purchase of RINs.

18 U.S.C. § 1343

8

## COUNT TWO

### (Money Laundering)

25.    The allegations in paragraphs 1 through 23 are realleged and incorporated herein.

26.    **HAILEY** used the proceeds of the above-described wire fraud scheme to make numerous purchases of luxury items. In particular, **HAILEY** conducted the following transactions with funds derived from account ****9901 at M&T Bank, all of which constituted the proceeds of the wire fraud offense.

a.    On February 25, 2010 **HAILEY** purchased a 2010 Nissan Armada from CarMax for $49,099.96 with Check 10037 from account ****9901.

b.    On April 19, 2010 **HAILEY** purchased a 2005 BMW 645 and a 2006 Chevrolet Impala from CarMax for a total of $53,539.38 with Check 10063 from account ****9901. The 2005 BMW was purchased for $37,014.50 and the 2006 Chevrolet Impala was purchased for $16,524.88.

c.    On April 27, 2010 **HAILEY** purchased a 2008 Mercedes Benz S-Class from Valley Motors for $76,568.94 with Official Check 300160757-7 for $66,568.94 from account ****9901, another $1000 from account ****9901, and $8500 from an unknown source.

d.    On May 3, 2010 **HAILEY** purchased a 2005 BMW 645 and a 2007 Cadillac Escalade from CarMax for a total of $64,261.91 with Check 10082 from account ****9901. The 2005 BMW 645 was purchased for $44,796.88 and the 2007 Cadillac Escalade was purchased for $19,465.02.

e.    On May 4, 2010 **HAILEY** purchased a 2008 Mercedes Benz S550 from CarMax for $63,421.82 with Check 10083 from account ****9901.

f.      On May 5, 2010 **HAILEY** purchased a 2007 BMW 650IC from BMW of Towson for $61,124.04 with Official Check 300160780X-X for $54,000 and Check 10087 for $7,124.04 both from account ****9901.

g.      On May 7, 2010 **HAILEY** purchased a 2007 BMW M6 from BMW of Towson for $69,849.82 with Official Check #300160785-6 for $35,000 from account ****9901, $9,849.82 in cash from an unknown source and $25,000 credit from a trade-in vehicle.

h.      On May 7, 2010 **HAILEY** purchased a 2006 BMW 650IC from BMW of Towson for $42,772.82 with Official Check #300160784-7 for $41,752.82 from account ****9901 and $1020 in cash from an unknown source.

i.      On May 12, 2010 **HAILEY** purchased a 2007 Cadillac Escalade from CarMax for $37,638.67 with Check 10089 from account ****9901.

j.      On May 21, 2010 **HAILEY** purchased a 2005 BMW 645CI from BMW of Towson for $44,549.82 with Official Check 300190725-0 for $35,000 and Check 10095 for $9,549.82 both from account ****9901.

k.      On May 28, 2010 **HAILEY** purchased a 2005 Rolls Royce Phantom from Ambassador Auto Sales for $149,504.95 with a wire transfer for $149,004.95 from account ****9901 and $500.00 charged on Visa card ending in #9854.

l.      On June 3, 2010, **HAILEY** purchased a house located at 10801 Catron Road, Perry Hall, MD for $634,139.00 plus applicable fees and taxes. On June 3, 2010, $645,330.16 was transferred into M&T Bank account ****3391 in the name of RODNEY and Tracy **HAILEY** from M&T Bank account ****9901. Official Check 300190759-2 for $645,330.16 was used to pay Milestone Title drawn off M&T Bank account ****3391.

m.      On June 9, 2010 **HAILEY** purchased a 2007 Lamborghini Murcielago from Lamborghini of Washington for $237,781.75 with Official Check 300190777-2 for $100,000.00

and Check 10111 for $20,281.75 both from account ****9901. A credit of $117,500.00 was given for a trade-in vehicle.

      n.      On July 6, 2010 **HAILEY** purchased a 2011 Ford F250 King Ranch and a 2011 Ford F250 from Al Packer's White Marsh Ford for a total of $118,191.00 with Official Check 300190866-3 for $110,000.00 and Check 10134 for $8,191.00 both from account ****9901. The 2011 Ford F250 King Ranch was purchased for $60,648.30 and the 2011 Ford F250 was purchased for $57,542.70.

      o.      On July 19, 2010 **HAILEY** purchased a 2007 Cadillac Escalade from CarMax for $39,796.88 with Check 10147 for $39,796.88 from account ****9901.

      p.      On July 20, 2010 **HAILEY** purchased a 2009 Ferrari F430FB from Ferrari & Maserati of Washington for $206,610.55 with Official Check 300190905 for $200,000.00 from account ****9901 and Check 1045 for $6,610.55 from account ****3160 in the name of RODNEY and Tracey **HAILEY**.

      q.      On July 30, 2010 **HAILEY** purchased a piece of property located at 9149 Rexis Avenue, Perry Hall, MD for $300,000.00 plus applicable fees and taxes. On July, 30, 2010, $300,000.00 was transferred into M&T account ****3160 in the name of RODNEY and Tracey **HAILEY** from M&T Bank account ****9901. On July 30, 2010, **HAILEY** obtained an Official CK# 300190938-3 made payable to himself in the amount of $294,413.18 drawn off M&T Bank account ****3160. **HAILEY** then endorsed the above-referenced check made payable to himself and gave the check to Sage Title Group, LLC. On July 30, 2010, Sage Title Group, LLC deposited check number 300190938-3 in the amount of $294,413.18 into their account.

      r.      On August 3, 2010 **HAILEY** purchased a 2007 Ferrari F430FB from Ferrari & Maserati of Washington for $170,174.07 with Check 10153 for $150,174.07 and Official Check 300190921-2 for $20,000.00 both from account ****9901.

s.     On August 10, 2010 **HAILEY** transferred $250,000.00 from account ****9901 to account ****0529 at M&T Bank, an account in the name of Genstarr Petroleum LLC, on which **HAILEY** and his wife are signatories. On the same day **HAILEY** purchased a 2009 Freightliner Tractor from Baltimore Freightliner for $118,771.00 with Official Check 300190972-5 drawn on account ****0529.

t.     On August 10, 2010 **HAILEY** purchased a 2010 Maserati Quattroporte from Ferrari & Maserati of Washington for $139,228.70 with Check 10152 for $139,228.70 from account ****9901.

u.     On August 11, 2010 **HAILEY** purchased a 2003 Beall 2 Axle Semi Tank Trailer from Opperman & Son for $32,555.00 with Check 10171 for $32,555.00 from account ****9901.

v.     On August 17, 2010 **HAILEY** purchased a 2003 Beall semi tank trailer and a 2004 Beall semi tank trailer from Southern Tank Leasing for $62,000.00 with Check 10172 for $62,000.00 from account ****9901.

w.     On September 6, 2010 **HAILEY** purchased a 2007 Lincoln Navigator from CarMax for $40,960.08 with Check 10132 for $40,960.08 from account ****9901.

x.     On September 7, 2010 **HAILEY** purchased a 2010 Freightliner truck from Oilmen's Truck Tanks Inc. for $190,288.00 with a wire transfer for $190,288.00 from account ****9901.

y.     On October 9, 2010 **HAILEY** purchased a 2011 Nissan Armada from CarMax for $52,429.02 with Check 1112 for $52,429.02 from M&T account ****3160. The check initially bounced and on October 13, 2010 $300,000.00 was transferred from account ****9901 to M&T Checking account ****3391 in the name of RODNEY and Tracey **HAILEY**. On October 18, 2010 $220,000.00 was transferred from account ****3391 to account ****3160 to cover the bounced check.

z.     On November 3, 2010 **HAILEY** purchased a 2007 Ferrari 612 Scag F1 from Ferrari & Maserati of Washington for $186,438.25 with Check 1060 for $186,438.25 from account ****3160. Initially the check bounced. On November 5, 2010 $95,000 was transferred from account ****9901 into account ****3160 and $95,000 was transferred from ****0529 into account ****3160. On October 13, 2010, $400,000 was transferred from account ****9901 into account ****0529 which funded the $95,000 transfer from account ****0529 to account ****3160.

aa.    On November 15, 2010 **HAILEY** purchased a 2010 Bentley CGTS and a 2010 Bentley CGT from Euro Motorcars for $377,210.38 with Check 9901 for $377,210.38 from account ****9901. The 2010 Bentley CGT was purchased for $187,582.82 and 2010 Bentley CGTS was purchased for $189,627.56.

bb.    On the following dates, **HAILEY** purchased men's and women's jewelry with funds derived from account ****9901:

| | | |
|---|---|---|
| 3/1/10 | 3.75 ct white gold diamond ring | $20,000.00 |
| 8/25/10 | diamond bracelet / white gold | $12,050.00 |
| 12/10/10 | diamond hoop earring, white gold w/ round cut diamonds | $10,900.00 |
| 12/10/10 | diamond tennis necklace w/ 23.94 ct in diamonds | $26,000.00 |
| 7/31/10 | diamond bracelet w/ 25.90 ct in diamonds & 137 gr gold | $13,000.00 |
| | Total | $81,950.00 |

13

## THE CHARGE

27.    On November 15, 2010, in the District of Maryland, the defendant

### RODNEY R. HAILEY

knowingly conducted a monetary transaction in criminally derived property of a value greater than

$10,000 that was derived from a specified unlawful activity, to wit: wire fraud.  The transaction

was the purchase of two Bentley automobiles from Euro Motorcars of Bethesda, Maryland, with a

check for $377,210.38 drawn on account ****9901 at M&T Bank, a financial institution engaged

in interstate commerce.

18 U.S.C. § 1957

## COUNT THREE

### (Violation of the Clean Air Act)

28.     The allegations in paragraphs 1 through 23 are realleged and incorporated herein.

29.     From in or about March 2009 until February 2011, in the District of Maryland, the

defendant        .

### RODNEY R. HAILEY

knowingly made false material statements, representations, and certifications in, and knowingly

omitted material information from, and knowingly concealed and failed to maintain notices,

applications, records, reports, and other documents required under the Clean Air Act, by (1) falsely

generating more than 32 million RINs without actually producing the corresponding renewable

fuel; (2) falsely reporting and omitting information from quarterly reports made to the EPA; (3)

making false material statements to the EPA in response to an official Request for Information

under Section 114(a) of the Clean Air Act; and (4) selling false and invalid RINs to brokers and oil

companies in the United States.

42 U.S.C. § 7413(c)(2)(A)
40 C.F.R. §§ 1152(c)(1)-(2); 80.1160(b)(1) and (b)(2); 80.1131(a)

## FORFEITURE

30.     Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of

an offense in violation of 18 U.S.C. § 1343, or a conspiracy to commit such offense, as alleged in

Count 1, the defendant shall forfeit to the United States of America all property, real and personal,

that constitutes and is derived from proceeds traceable to the scheme to defraud.

31.     The property to be forfeited includes, but is not limited to, the following:

      a.     A sum of money equal to the value of the proceeds of the scheme to defraud

         which amount is at least **$ 9,091,230.80** ;

      b.     The real property, automobiles and jewelry listed in Count 2 of this

         Information, and all property traceable to such property, ;

      c.     All funds seized on or about May 13, 2011 from the accounts at M&T Bank

         held by RODNEY HAILEY, including account ****9901, and all funds in

         any other account at M&T Bank, Bank of America, JP Morgan Chase or any

         other financial institution traceable to account ****9901;

      d.     All personal property seized from or surrendered by the defendant since May

         13, 2011, including but not limited to electronic consumer items, articles of

         clothing, and artwork;

      e     All property, real or personal, purchased with, or traceable to, the scheme to

         defraud and subsequently transferred to a third party; and

      f.     Any security deposit or residual rent to which the defendant is entitled from

         the leases on real property in Anaheim, CA and New York, NY.

32.     If any of the property described above, as a result of any act or omission

of the defendants:

      a.     cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without

        difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section

2461(c).

18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)
F.R.Crim.P. Rule 32.2(a)


10|3|11
Date

Rod J. Rosenstein
United States Attorney