IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

UNITED STATES OF AMERICA,         *

    Plaintiff,                    *

        v.                         *   CRIMINAL NO.: WDQ-11-0540

RODNEY R. HAILEY,                 *

    Defendant.                    *

*  *  *  *  *  *  *  *  *  *  *  *  *  *

MEMORANDUM OPINION

Rodney Hailey is charged with 42 counts of wire fraud, money laundering, and violations of the Clean Air Act. Trial is scheduled for June 18, 2012. For the following reasons, Hailey's motions to suppress will be denied.

I.    Background

Hailey is charged with eight counts of fraud, in violation of 18 U.S.C. § 1343, 32 counts of money laundering, in violation of 18 U.S.C. § 1957, and two counts of violating the Clean Air Act, 42 U.S.C. § 7413(c)(2)(A). ECF No. 19.[1] Hailey's company, Clean Green Fuel ("Clean Green"), was registered with the Environmental Protection Agency ("EPA") as a bio-fuel producer. The grand jury has alleged that Clean Green sold more than 32

---

[1] Hailey was originally charged with five counts of violating the Clean Air Act. See ECF No. 19 at 16. On May 22, 2012, the Court granted the government's motion to dismiss three of those counts. ECF No. 66.

million fake renewable fuel credit identification numbers ("RIN") to brokers and oil companies,[2] for more than $9 million. Hailey allegedly caused several banks to transmit wire transfers to Clean Green's account by making false representations and promises related to pay for the fake RINs. *Id.* at 2-7. Hailey allegedly used the profits from his scheme to buy luxury cars, trucks, real property, and jewelry. *Id.* at 14-15.

A.   July 2010 Interviews with Hailey

On July 22, 2010, EPA Enforcement Officers Mario Jorquera and Ross Ruske, without warning Hailey, visited Clean Green's offices to investigate a complaint that Clean Green had been selling fake RINs. ECF No. 62-1 ¶22. The officers introduced themselves and told Hailey they were interested in Clean Green's production process. ECF No. 70-1 at 1. Officer Ruske testified that he or Officer Jorquera explained that they were civil investigators and were not conducting a criminal investigation. The officers do not carry firearms, did not arrest Hailey, made no threats to him, and promised him nothing in exchange for talking to them.

Hailey inspected the officers' credentials, escorted them to a conference room, and described the process his company used

---

[2] The Clean Air Act and the Energy Policy Act requires companies that market petroleum products in the United States to either produce a certain amount of renewable fuel or buy from renewable fuel producers RINs for an equivalent amount of renewable fuels. ECF No. 19 at 2.

to convert waste oil into bio-diesel. ECF No. 70-1 at 1. He told the officers that he had recently stopped producing bio-diesel fuel. ECF No. 62-1 ¶26. He made several inconsistent or incriminating statements that the government intends to introduce at trial.[3]

On July 28, 2010, Officers Jorquera and Ruske met Hailey and his attorney, Steven Bers, Esq., at Clean Green's offices. Hailey and Bers made a series of statements further explaining Clean Green's process and customers. The four then drove to Clean Green's production facility, at 7521 Pulaski Highway, an empty warehouse. ECF No. 70-1 at 3-5.

B.   The Warrants

On May 11, 2011, Magistrate Judge Beth P. Gesner issued 27 seizure and three search and seizure warrants for Hailey's home, offices, bank accounts, and items he allegedly bought with Clean Green funds. ECF No. 62 at 4. The applications for the warrants were supported by affidavits of an EPA criminal investigator ("CI"), Daniel Salak, and a Task Force Officer ("TFO") for the Internal Revenue Service ("IRS"), Michael Aiosa. ECF Nos. 62-1, 62-2.

---

[3] For example, Hailey was unable to specify the location of his production facility or point to it on a "Google Maps Street View" computer image. He also said that he had not kept records of the bio-diesel production and RIN sales. ECF No. 70-1 at 1-2.

TFO Aiosa stated the following about fraud and the production of false RINs:

1. Hailey is the CEO and President of Clean Green, a Maryland corporation located at 9940 Franklin Square Drive, Suite E, Nottingham, Maryland. ECF No. 62-1 ¶¶8, 9.
2. On March 26, 2009, Hailey registered Clean Green with the EPA as a producer of bio-fuel and listed 10939 Philadelphia Road, White Marsh, Maryland, as its production facility. *Id.* ¶21.
3. In March, 2010, Hailey sent the EPA a quarterly report claiming that from October through December, 2009, Clean Green had produced 2,227,500 gallons of bio-diesel fuel. *Id.* He has sent the EPA no other reports. *Id.*
4. On July 22, 2010, two EPA Air Division civil inspectors visited 9940 Franklin Square to inspect the bio-diesel production facility. They suspected that Clean Green had been selling false RINs. *Id.* ¶22.
5. Hailey told the inspectors that his production facility was located on Shell Road, in Curtis Bay, Maryland, but he did not know its exact address. *Id.* ¶24.
6. Hailey said that he paid others to recover waste vegetable oil from 2700 restaurants in the area and bring it to the production facility for conversion to bio-diesel fuel. Hailey did not know the names of the restaurants because, he said, only the drivers who collected the oil knew the names. He also did not know the names of any drivers. *Id.* ¶25.
7. Hailey told the inspectors that he had no samples of his product because he had recently stopped making bio-diesel. *Id.* ¶26.
8. Hailey told the inspectors that he kept his business records--about collecting the oil, production data, and bio-diesel sales--at the Shell Road production facility. *Id.* ¶27.
9. On July 28, 2010, the EPA inspectors returned to 9940 Franklin Square and met with Hailey and his attorney. Hailey told the inspectors that he had been mistaken when he said the production facility was on Shell Road; in fact, he said, its address was 7521 Pulaski Highway, Rosedale, Maryland. *Id.* ¶28.
10. The inspectors inspected the Pulaski Highway facility. They found three "unused tanks," one plastic tank, and a computer without a processor on a desk. *Id.* ¶29. They did not find other equipment necessary to produce bio-

diesel from waste vegetable oil, such as mixing tanks and chemicals for mixing with the oil. Id.
11. Hailey twice said that he had sold the missing equipment when he closed the business, but could not remember to whom he sold it. When asked for records of the sales, he said he had given the equipment away because he could not sell it, and had no record. Id. ¶¶30-31.
12. Hailey showed pictures to the inspectors of what he said was the facility in operation, but the inspectors concluded the pictures showed "an entirely different location." Id. ¶30.
13. "Based on their observations, and coupled with Hailey's responses [to their questions], the inspectors concluded that Hailey had not actually produced any bio-diesel fuel." Id. ¶23.

TFO Aiosa stated the following about money laundering:

1. Hailey was "associated" with Genstarr Petroleum LLC, TAOH Solutions & Consulting LLC, I-Genovations LLC, and ECO-Energy, all of which were located at Clean Green's office address, 9940 Franklin Square Drive, Suite E, Nottingham, MD 21236. ECF No. 62-1 ¶9.
2. Hailey's wife, Tracey Oliver Hailey, owns part of TAOH Solutions & Consulting LLC. Id. ¶10.
3. Based on a review of Hailey's, Tracey Oliver Hailey's, and Clean Green's bank records:
   a. Hailey deposited into an account ending in 9901 ("the 9901 account") at M&T Bank $8,403,400.80[4] from the sale of fake RINs to MudSkippers Investments, Ocean Connect.com, Inc., International Exchange Services, and Conoco Phillips. Id. ¶35. All but $34,980--from MudSkippers--was wired to M&T Bank. Id.
   b. The $8.4 million was disbursed from the 9901 account into 12 other M&T Bank accounts, held in the names of: Hailey, Tracy Oliver Hailey, Kevin Opher, Jermaine Conyers,[5] or one of the entities with which Hailey was associated. Id.
   c. All other deposits into the 13 M&T Bank accounts "were for minimal amounts." Id. ¶36.

---

[4] The affidavit listed the amount allegedly received from each bank. ECF No. 62-1 ¶35.

[5] Opher and Conyers were allegedly Clean Green employees, and "only appear[ed] as co-signors on business account[s]." ECF No. 62-1 ¶35.

      d. Between February 25, 2010 and November 16, 2010, Hailey, his companies, and employees, and Tracey Oliver Hailey, used money traceable to the 13 M&T Bank accounts to buy 22 automobiles, costing $2,087,239.53. *Id.* ¶37, Attach. B.
      e. Hailey drew $365,905 from the 9901 account to buy three diesel trailers. *Id.* ¶38, Attach. C.
4. On May 10, 2011, TFO Aiosa learned that Hailey had tried to sell a 2007 Ferrari, purchased with funds from the 13 M&T Bank accounts, to a Ferrari dealer for $130,000. The dealer sent Hailey a check for that amount payable to Rodney Hailey. Federal Express held the check for the investigators. *Id.* ¶40.

    CI Salek incorporated TFO Aiosa's affidavit into his own. ECF No. 62-3 ¶¶7-11. Both officers explained their backgrounds, including experience with fraud, money laundering, and Clean Air Act investigations, and noted common aspects of those crimes, and typical sources of data for people involved in businesses. *See id.*; ECF No. 62-2 ¶¶9-11, 17-19.

    C.   Execution of the Warrants and May 2011 Interview

    On May 12, 2011, law enforcement agents executed the warrants in Baltimore and California. They seized "relevant documents and computers" from Hailey's home, Clean Green's office, and Clean Green's production facility in Baltimore. They seized Hailey's automobile collection at a home he rented in California. ECF No. 62 at 4. While executing the seizure warrants in California, EPA Criminal Investigation Division ("CID") Special Agent ("SA") Chris Anderson and IRS CI SA Catherine Chow spoke with Hailey. ECF No. 68 at 2; ECF No. 70-2 at 1-2.

SA Chow testified that she led the warrant execution team;[6] local police told Hailey that a suspicious person had been seen in the area; they asked Hailey to open the gate to the property so that they could look for the suspect. After Hailey opened the driveway gate, the federal agents met him about halfway down the driveway. SA Chow introduced herself and told Hailey that she was there to seize the automobiles. SA Chow did not draw her weapon, and she did not recall that other agents had their weapons drawn when she was speaking with Hailey. Hailey was cooperative and helped the agents take the automobiles: he located the keys to each car, helped open the garage doors, and showed the agents how to operate the automobiles so that they would not be damaged during the seizure.

SA Chow testified that about two hours after the agents began the seizure, at about 10:00 a.m., SA Anderson received a call from an EPA agent on the East Coast, asking SA Anderson to try to interview Hailey, if Hailey was willing. SA Anderson and SA Chow asked Hailey if he was willing to speak with the agents; Hailey said he was. ECF No. 70-2 at 1. Bers was not present for the interview. *Id.* at 2. The agents spoke to Hailey in the foyer of the home, and Hailey left the area several times to help with the automobiles. Hailey told the agents that he had

---

[6] SA Chow testified that to prepare for executing the warrant, she read Aiosa's affidavit, which noted that Bers represented Hailey and Clean Green in the civil investigation.

worked in the bio-diesel industry for 12 years, he owned Clean Green, and produced bio-diesel from waste oil. ECF No. 70-2 at 1. Hailey said he did not advertise Clean Green and gave away, instead of selling, his bio-diesel. He said he kept no records of his transactions. *Id.* Hailey told the agents that he closed Clean Green on June 28, 2010 because bio-diesel production had become too complicated and unprofitable. *Id.* at 2. He did not know what was in shipping containers which agents had found at the empty production warehouse. *Id.*

At 10:21 a.m., SA Anderson received a telephone call from SA Salek, telling SA Anderson to end the interview immediately because Hailey had counsel for criminal matters. While SA Anderson was on the telephone, Hailey told SA Chow that he had used the production facility for storage since closing the business. *Id.* SA Anderson ended the interview at 10:25 a.m. *Id.*

On August 1, 2011, Hailey signed, and TFO Aiosa witnessed, a consent form authorizing TFO Aiosa "and any other persons designated by IRS Criminal Investigation to conduct at any time a complete search of [t]he following electronic devices: Sony Model PCG-81114L, S/N-27514932-3018500. ECF No. 62-3. He certified that he owned the devices and information in them, and voluntarily relinquished his right to privacy in them. *Id.*[7]

---

[7] The circumstances under which Hailey signed the consent forms are not available in the record.

On August 17, 2011, Hailey signed a consent form authorizing "[CI] Salak and NCFL, Special Agent(s) with the US EPA Criminal Investigation Division . . . and/or other person(s) designated by them" to search his "HTC-Sprint" mobile phone. He affirmed that he had voluntarily relinquished his right to privacy and authorized the agents to copy the information stored on the phone. ECF No. 62-4 at 2. He also authorized the EPA Office of Criminal Enforcement to search email accounts used by his companies. *Id.* at 1.

On October 3, 2011, a criminal information was filed against Hailey charging wire fraud, money laundering, and violations of the Clean Air Act. ECF No. 1.

Hailey has moved to suppress evidence obtained pursuant to search and seizure warrants, and statements he made to EPA officials. ECF Nos. 52, 68, 74. The government has opposed the motions. ECF Nos. 62, 70, 80. On June 5, 2012, an evidentiary hearing was held on the motion to suppress Hailey's statements; Hailey rested on his brief for his challenge to the search and seizure warrants.

II. Analysis

The government intends to introduce at trial "documents and tangible items" collected pursuant to the search and seizure warrants, and statements Hailey made to EPA and IRS officers. ECF No. 52 ¶2; ECF No. 68 ¶2. Hailey has moved to suppress the

physical evidence as obtained in an unlawful search and seizure, and his statements acquired as fruit of the unlawful seizures and in violation of his right against self-incrimination. ECF No. 52 ¶2.

### A. Validity of the Search Warrants

Hailey contends that "the government obtained and then executed the search and seizure warrants in violation of [his] rights under the Fourth Amendment to the United States Constitution." ECF No. 52 ¶2.[8] The government counters that the warrants were properly issued because there was probable cause to believe that evidence of a crime would be found in Hailey's house, office, and production facility, and there was a nexus between the crimes alleged and the vehicles, documents, and computers authorized for seizure. ECF No. 62 at 6.

An affidavit supporting a valid search or seizure warrant must give a magistrate judge "a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239 (1983). The judicial officer taking the warrant application must decide whether, under the circumstances as stated in the affidavit, "'there is a fair probability that contraband or evidence of a crime will be found

---

[8] Although Hailey argued that the government executed the warrants in violation of his Fourth Amendment rights, he has not challenged any aspect of the execution. *See* ECF No. 52 ¶2.

in a particular place.'" *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011) (*quoting Gates*, 462 U.S. at 238). To justify seizure of property which is not evidence or contraband, the government must establish probable cause to believe that the seized property is subject to forfeiture--there must be a nexus between the property and the illegal activity. *United States v. Dupree*, 781 F. Supp. 2d 115, 126, 133 (E.D.N.Y. 2011).

Here, TFO Aiosa's affidavit--incorporated by reference in CI Salek's application--demonstrated a "fair probability" that evidence of the sale of fake RINs would be found at Hailey's office and production facility. Hailey's inconsistent statements and inability to identify or locate records of the sources of his vegetable oil donors, or the buyer of his equipment, and his provision of a photograph of another facility, ECF No. 62-1, showed that Hailey had probably issued RINs without producing bio-diesel, and fraudulently caused wire transfers. There was "a fair probability that contraband or evidence of a crime [would] be found" in Hailey's business records and in his home, office, and production facility. *See Allen*, 631 F.3d at 172.

That Hailey and his agents used the money in the M&T Bank accounts—which only contained money paid for allegedly fake RINs—to buy 22 automobiles provides the necessary nexus between the property and the illegal activity. Hailey's bank accounts

11

are similarly tied to the criminal activity as Hailey caused the RIN payments to be wired to them, and was emptying them with purchases of the automobiles. See *Dupree*, 781 F. Supp. 2d at 132.

Hailey's motion to suppress evidence obtained pursuant to the search and seizure warrants will be denied.

B.   Validity of Hailey's Consent to Search

Hailey does not appear to challenge his consent to search his computer and phone, except to the extent his consent was the fruit of the warranted searches and seizures. See ECF No. 52 ¶2. As the warrants were valid, the motion to suppress evidence obtained with Hailey's consent will be denied.

C.   Voluntariness of Hailey's Statements

Hailey contends that all the statements he made to the EPA agents on July 22 and 28, 2010 were involuntary. ECF No. 68 ¶2. Hailey argues that his attorney's absence rendered his May 12, 2011, statements involuntary. See ECF No. 74 at 3 (arguing that attorney's absence "bears on the Fifth Amendment right against compelled self-incrimination").[9] He contends that his May 2011 statements were taken in violation of Department of Justice

---

[9] Hailey did not have a Sixth Amendment right to the assistance of counsel because adversary proceedings had not been instituted against him. See *United States v. Alvarado*, 440 F.3d 191, 199-200 (4th Cir. 2006) (the Sixth Amendment right to counsel attaches when the "process shifts from investigation to prosecution" (internal quotation marks omitted).

12

regulations and should therefore be suppressed.[10] He concedes that he was not in custody, but argues that "[t]he agents' disregard for the right to counsel demonstrates the involuntary nature of the encounter." Id. (citing United States v. Saunders, 954 F.2d 227 (4th Cir. 1992)).[11]

---

[10] Hailey argues that the interview violated the United States Attorney's Manual ("USAM") and Department of Justice United States Attorney's Manual Criminal Resource Manual ("CRM"). ECF No. 74 at 3. The USAM states that United States Attorneys are governed by the ethical rules of the state where they practice. USAM § 9-13.200 (2005) (citing 28 U.S.C. § 530B). The CRM discusses Rule 4.2 of the American Bar Association's Model Rules of Professional Conduct as it applies to government attorneys. CRM, § 296, available at http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/crm00296.htm. Rule 4.2 governs communication between a lawyer representing a party and a person the lawyer knows to be represented by another lawyer in the same matter. See id.

Neither the USAM nor the CRM proscribes government attorney conduct; they direct the attorney to the state ethical rules and comment on issues common to most state ethical rules. See id. §§296-98. Further, the CRM notes that "Several jurisdictions have established . . . a law enforcement investigatory exception to the contact rule in limited circumstances. . . . A few courts have recognized such an exception in connection with overt, pre-indictment contacts during a criminal investigation." Id. (citing United States v. Dobbs, 711 F.2d 84 (8th Cir. 1983); United States v. Joseph Binder Schweitzer Emblem Co., 167 F. Supp. 2d 862 (E.D.N.C. 2001)). Under that exception, government agents may conduct a noncustodial interview of a suspect during an investigation, even if the government knows that the suspect has retained counsel. See Dobbs, 711 F.2d at 86.

[11] Hailey also argues that the statements were the fruit of an unlawful search and seizure. ECF No. 52 ¶2. As the searches and seizures were lawful and two of the conversations occurred before any search or seizure, that ground is not a basis for relief.

The Fifth Amendment bars the use at trial of involuntary confessions obtained by the government. *See Hutto v. Ross*, 429 U.S. 28, 30 (1976). A statement is involuntary if "the defendant's will has been overborne or his capacity for self-determination critically impaired."[12] *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012) (internal quotation marks omitted). The Court considers "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* at 591-92 (internal quotations omitted).[13]

---

[12] This standard is taken from the Fourteenth Amendment confession context. *Colorado v. Connelly*, 479 U.S. 157, 169 (1986).

[13] Voluntariness is not "to be equated with the absolute absence of intimidation." *United States v. Pelton*, 835 F.2d 1067, 1072 (4th Cir. 1987) (internal quotation marks omitted). "Coercive police activity is a necessary predicate to a finding that a confession is not voluntary." *United States v. Cristobal*, 293 F.3d 134, 140-41 (4th Cir. 2002). Only egregious behavior, such as subjecting a suspect to "severe physical abuse," holding him "incommunicado and question[ing him] for over 36 hours without sleep or rest," or threatening him "with a loaded gun while wounded," generally justifies a finding that a confession is involuntary. *Id.* at 140. Threatening to keep a parent from his or her children can also justify a finding that a confession was involuntary. *See Pelton*, 835 F.2d at 1073 (holding that FBI promise not to investigate was not coercive or analogous to *Ferguson v. Boyd*, 566 F.2d 873 (4th Cir. 1977), in which a man involuntarily confessed "in return for the release of his girlfriend, who had been improperly held without bond away from her young children for a week," or *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), in which the defendant involuntarily confessed after being told "that if she did not cooperate she would not see her children again for a very long time"). Even a

Hailey has identified no coercive activity by the EPA or IRS agents interviewing him and has not explained how the May 2011 interview in the absence of his retained counsel was coercive. Before the July 2010 interviews, the EPA agents made clear to Hailey that he was not under criminal investigation; they did not threaten him or promise anything in exchange for the interview. Hailey and his family were not restrained or separated by officers. Hailey was able to freely move about during the interviews; he chose the location of the first interview, and brought his attorney with him for the second. The possibility that Hailey's business could be subject to civil penalties or closed--the business had already closed--is not comparable to the coercive conduct that has rendered other statements involuntary. *See Cristobal*, 293 F.3d at 140.

Hailey's statements to the officers in California were also voluntary. That a non-custodial interrogation takes place without the defendant's attorney, without more, does not render it coercive.[14] Here, the question is whether Hailey's statements

---

promise to stop an agency investigation is usually not coercive. *See Pelton*, 835 F.2d at 1070-71.

[14] *See United States v. Senogles*, 570 F. Supp. 2d 1134, 1162 (D. Minn. 2008) (considering, as one factor among many, that defendant never asked for an attorney). In *Saunders*, on which Hailey relies, the Fourth Circuit considered whether the administration and waiver of *Miranda* rights necessarily "removed the taint of" an illegal arrest. 954 F.2d at 231. It held that it did not, and remanded for the district court to consider

15

to EPA officers, made when he was not in custody, were involuntary solely because his attorney was not present. *See* ECF No. 68 ¶2.C. Unlike in *Saunders*, here, no prior unconstitutional activity tainted the officers' questioning of Hailey. *See Saunders*, 954 F.2d at 231.[15]

As Hailey has not shown that his will was overborne and his confession was involuntary under the Fifth Amendment standard, *see Cristobal*, 293 F.3d at 140-41, the motion to suppress will be denied.

---

other factors in determining whether a statement made after Saunders waived his *Miranda* rights was voluntary. *Id.* These distinctions make *Saunders* unhelpful.

[15] The Court need not determine whether the May 2011 interview violated attorney ethical rules because, even if the agents' communication with Hailey violated those rules, suppression would not be the proper remedy. *See United States v. Dobbs*, 711 F.2d 84 (8th Cir. 1983); *United States v. Lowery*, 166 F.3d 1119, 1125 (11th Cir. 1999) ("[A] state rule of professional conduct cannot provide an adequate basis for a federal court to suppress evidence that is otherwise admissible."); *United States v. Joseph Binder Schweitzer Emblem Co.*, 167 F. Supp. 2d 862, 867 (E.D.N.C. 2001); *United States v. Guerrerio*, 675 F. Supp. 1430, 1433 (S.D.N.Y. 1987) ("[S]uppression is an inappropriate remedy" for a prosecutor's violation of ethical rule prohibiting communication with a represented party.).

In *United States v. Worthington*, 911 F.2d 726 (table) (4th Cir. 1990), the Fourth Circuit "doubt[ed] . . . the correctness" of *United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988), on which Hailey relies, which held that suppression may be an appropriate remedy for a violation of the no-contact rule. Despite its holding, *Hammad* did not suppress the statements taken in violation of the rule. 858 F.2d at 842. The Court will not exercise its "general supervisory authority to remedy issues associated with contacting represented parties," ECF No. 74 ¶5, to impose an inappropriate sanction for a possible ethical violation.

## III. Conclusion

For the reasons stated above, Hailey's motions to suppress will be denied.

_____6/13/12_____                           ___/s/_____
Date                                        William D. Quarles, Jr.
                                            United States District Judge